UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:11CV177-H

JULIE HUEY,
o/b/o A.H., a minor.                                                                    PLAINTIFF

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security                                                  DEFENDANT

**MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

Before the Court is the complaint (DN 1) of Julie Huey filed on behalf of her minor child A.H. ("plaintiff") seeking judicial review of the final decision of the Commissioner pursuant to 42 U.S.C. §405(g). The plaintiff is represented by attorney Gregory Marks. Both the plaintiff (DN 13) and the defendant (DN 14) have filed a fact and law summary. The district judge has referred this case to the undersigned magistrate judge (DN 11) to review the fact and law summaries and to submit a report and recommendation. 28 U.S.C. §636. By order entered on June 1, 2011 (DN 11), the parties were notified that oral arguments would not be held unless a written request therefore was filed and granted. No such request was filed.

On April 20, 2007, the plaintiff filed an application for childhood supplemental security income benefits ("childhood SSI") alleging that A.H. became disabled at birth on August 16, 2002 as a result of heart problems, a speech impairment, developmental delays, a hearing impairment, and learning disabilities (Tr. 125). Administrative Law Judge Phyllis Pierce ("ALJ") conducted a hearing on June 10, 2009 in Owensboro, Kentucky (Tr. 12). The plaintiff was present and represented by counsel Greg Marks. In support of her decision denying childhood SSI, the ALJ entered the following numbered findings:

1.  The claimant was born on August 16, 2002.  Therefore, she was a preschooler on April 20, 2007, the date application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2.  The claimant has not engaged in substantial gainful activity since April 20, 2007, the application date (20 CFR 416.924(b) and 416.971 *et seq*.).

3.  The claimant has the following severe impairment: Williams syndrome (20 CFR 416.924(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.  The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 DFR 416.924(d) and 416.926a).

6.  The claimant has not been disabled, as defined in the Social Security Act, since April 20, 2007, the date the application was filed (20 CFR 416.924(a)).

Plaintiff timely filed a request for the Appeals Council to review the ALJ's decision, which was denied (Tr. 1-3).  Thus, the ALJ's decision became the final decision of the Commissioner. 42 U.S.C. §405(g).

## **GENERAL STANDARDS GOVERNING JUDICIAL REVIEW**

The court has jurisdiction to examine the record that was before the Commissioner on the date of the Commissioner's final decision and to enter a judgment affirming, modifying, or reversing that decision.  42 U.S.C. §405(g), sentence four.  In exercising its "sentence four" jurisdiction, the court is limited to determining whether the Commissioner's controlling findings are supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching the decision.  *Richardson v. Perales*, 402 U.S. 389 (1971).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Kirk v. Secretary*, 667 F.2d 524

(6th Cir. 1981). It has been described as a sufficient amount of evidence "to justify, if the trial were to a jury, a refusal to direct a verdict." *Sias v. Secretary*, 861 F.2d 475, 480 n. 1 (6th Cir. 1988). In determining whether the Commissioner's findings are supported by substantial evidence, the court must examine the evidence in the record taken as a whole and must take into account whatever in the record fairly detracts from its weight. *Wyatt v. Secretary*, 974 F.2d 680 (6th Cir. 1992). However,

> The substantial evidence standard allows considerable latitude to administration decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interferences by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.

*Mullen v. Secretary*, 800 F.2d 535, 545 (6th Cir. 1986).

When conducting a substantial evidence review, the court is restricted to a consideration of the evidence that was before the Commissioner on the date of the final decision. When the Appeals Council declines to review the ALJ's decision and render a new decision, the ALJ's decision becomes the Commissioner's final decision. *Cotton v. Secretary*, 2 F.3d 692 (6th Cir. 1993).

### PURPOSE OF CHILDHOOD SSI

In 1972, Congress overhauled the Social Security Act and produced the SSI program – a system of payments to needy individuals who, for various reasons, are unable to work. Pub L. No. 92-603, §301, 86 Stat. 1329, 1465 (1972)). While the primary focus of the legislation was benefits for adults, Congress included a provision making disabled children eligible for SSI payments as well. Congress has never clearly established the precise purposes of SSI for children, and the analysis for childhood SSI arguably requires a degree of "mental gymnastics" when determining whether a child is disabled from working. It would seem that Congress created a type

of "legal fiction" in an altruistic attempt to financially assist economically disadvantaged disabled children. This Court notes the official legislative history of the 1972 Act:

> [D]isabled children who live in low-income households are certainly among the most disadvantaged of all Americans and . . . they are deserving of special assistance in order to help them become self-supporting members of our society. Making it possible for disabled children to get benefits under this program, if it is to their advantage, rather than under the programs for families with children, would be appropriate because their needs are often greater than those of nondisabled children. The bill, accordingly, would include disabled children under the new program. Parents' income and resources would be taken into account . . . . H.R.Rep. No. 92-231, at 147-48.

To qualify for SSI, a child must be disabled under the Social Security Act. Before 1990, a child was "disabled" if s/he suffered from any medically determinable physical or mental impairment of "comparable severity" to an impairment that would preclude an adult from working. In 1990, the United States Supreme Court decided *Sullivan v. Zebley*, 493 U.S. 521 (1990), wherein it determined that the Commissioner must adopt a functional approach to child disability claims. Between 1990 and 1996, the Commissioner "substantially liberalized" the childhood SSI eligibility regulations to provide for an individualized functional analysis ("IFA"). *See Haws ex rel. Haws v. Apfel*, 61 F.Supp.2d 1266, 1272 (M.D.Fla. 1999). However, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 eliminated the use of the "IFA" and reverted to a more stringent standard. We were eventually left with the current statutory standard requiring a finding of either one "extreme" limitation or two "marked" limitations in the six broad domains of childhood development.

# **STANDARDS GOVERNING CHILDHOOD SSI CLAIMS**

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), amended the Social Security Act to define "disabled" with respect to children, to require that:

> (i) an individual under the age of 18 . . . be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.
>
> (ii) Notwithstanding clause (i), no individual under the age of 18 who engages in substantial gainful activity . . . may be considered disabled.

Pub. L. No. 104-193, 110 Stat. 2105 (Aug. 22, 1996), codified at 42 U.S.C. §1382c(a)(3)(C). The rules implementing the Act establish a three-step sequential evaluation process. 20 C.F.R. §§ 416.924(b)-(d). First, the child must not be engaged in substantial gainful activity. Second, the impairment or combination of impairments must be severe. Third, the impairment must meet, medically equal, or functionally equal the criteria of an impairment in the Listing of Impairments at Appendix 1, Subpart P, Regulation No. 4.

The plaintiff argues that A.H. suffers from a condition that functionally equals the Listing. An impairment or combination of impairments is deemed the functional equivalent of a listed impairment if it sufficiently adversely impacts upon one or more of six broad areas of development and functioning: 1) the ability of the child to acquire and use information; 2) to attend and complete tasks; 3) to interact and relate with others; 4) to move about and manipulate objects; 5) the child's ability to care for himself; and 6) the child's health and physical well-being. 20 C.F.R. §416.926a(b)(1). A finding of functional equivalence is required if the impairment causes an "extreme" limitation in one area or a "marked" limitation in two or more areas. Section 416.926a(a). A "marked" limitation is one that:

5

> . . . interferes seriously with your ability to independently initiate, sustain, or complete activities . . . [It] also means a limitation that is more than moderate but less than extreme. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

Section 416.926a(e)(2)(i).

An "extreme" limitation is one that:

> . . . interferes very seriously with your ability to independently initiate, sustain, or complete activities . . . . "Extreme limitation" also means a limitation that is more than marked. "Extreme limitation" is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of functioning that we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

Section 416.926a(e)(3)(i).

## **DISCUSSION**

A.H., the child in this case, was born on August 16, 2002. Disability is alleged beginning from birth due to Williams syndrome and accompanying heart problems, a speech impairment, developmental delays, a hearing impairment, and learning disabilities (Tr. 125). According to the National Center for Biotechnology Information/U.S. National Library of Medicine, Williams syndrome is a rare genetic disorder caused by missing genes, and occurs in about 1 in 8,000 births.[1] The condition is characterized by medical problems including cardiovascular disease, developmental delays, and learning disabilities.[2] According to the American Academy of Pediatrics Policy

---

[1] http://www.ncbi.nlm.hih.gov/pubmedhealth/PMH0002105.

[2] http://www.williams-syndrome.org/what-is-williams-syndrome. Common features of Williams syndrome include a characteristic elfin facial appearance; heart and blood vessel problems; elevated blood calcium levels; low birth weight/slow weight gain; feeding problems; irritability or colic in infancy; dental abnormalities; kidney abnormalities; hernias; sensitive hearing, musculoskeletal problems due to joint laxity and low muscle tone; overly friendly

6

Statement on Healthcare Supervision for Children with Williams Syndrome, cognitive, motor and language delay in the Williams child is universal, and in 75% of the children, mental retardation is ultimately diagnosed (Tr. 408).

At the time of the hearing the child had just completed the first grade, but was scheduled to repeat it (Tr. 20). According to her mother, A.H. is in a regular classroom, but attends special education for one hour per day, and is behind in both the regular classroom and in special ed (Tr. 20-21). The mother testified that A.H. has developmental delay, cardiovascular problems, and contractures with pain in her legs and arms as a result of Williams syndrome (Tr. 21-22). A.H. has undergone both speech and occupational therapies in school as a result of her developmental delays (Tr. 22), and testing reveals she is in the low range of cognitive skills (Tr. 323). The mother testified that A.H. receives occupational therapy to help her hold a pencil and scissors (Tr. 22). According to her mother, A.H. has contractures and joint pain in her legs and arms as a result of the Williams syndrome, for which physical therapy has been recommended (Tr. 21, 24, 27). A.H. complains of pain in her legs and arms on a daily basis, and her mother gives her Motrin when she cries from the pain (Tr. 23-4; 25). The pain A.H. experiences limits her activities (Tr. 32).

A.H. is followed for a heart condition (mild to moderate obstruction just above the aortic valve Tr. 456) related to the Williams syndrome through Pediatric Cardiology Associates in Louisville, Kentucky; A.H. may ultimately require heart surgery (Tr. 27). The treating pediatric cardiologist, Dr. Villafane, has warned A.H.'s school and parents to be prepared for a sudden cardiac event (Tr. 450, 456). A.H. complains of chest pain and palpitations (Tr. 343, 419), and must lie

---

personality, with no fear of strangers and difficulty recognizing nuanced social cues; developmental delays; learning disabilities; and attention deficit disorder. *Id*.

down for awhile until the chest pain subsides (Tr. 31-32).

Dr. Alexander Asamoah is a genetic specialist and Associate Professor of Pediatrics at the University of Louisville School of Medicine. He is a clinical geneticist at the Weisskopf Child Evaluation Center where A.H. was initially diagnosed with Williams syndrome. He follows her yearly for a review of her symptoms. His records indicate as follows:

> [A.H.] has Williams syndrome. It is a genetic condition caused by missing genes on the long arm of chromosome 7. She has developmental delay and [is] very friendly which are seen as part of the Williams syndrome phenotype. Because of this friendliness they may seem to be less delayed than they are. Their verbal skills such as their expressive vocabulary are usually more advanced than other skills, such as math or spacial analysis. Therefore their learning environment needs to be specifically catered to their strengths and weaknesses. They struggle with a short attention span. Anxiety is sometimes seen in children and adults with Williams syndrome, as well as perseverating on favorite conversation topics. [She] has significant delays related to her diagnosis and should qualify for SSI or some type of government disability insurance.
>
> Individuals with Williams syndrome have elevated levels of blood calcium, which can cause irritability and other medical issues. Her physician ordered her labs in November 2008. These should be done yearly prior to her coming to Genetics for follow-up evaluation.
>
> [A.H.] has hyperextensible joints and she complains about pain. I will suggest that her PCP refer her for physical therapy evaluation. She also complains of abdominal pains a lot. This could be due to reflux. I suggested that her parents try her on Zantac to see if the pain symptoms will subside.
>
> We would like to reevaluate [her] in a year. ... (Tr. 321-2)

## **ANALYSIS**

In her decision denying childhood SSI benefits, ALJ Pierce found that A.H.'s medically determinable impairment (Williams syndrome) could reasonably be expected to produce some of the symptoms alleged; however, the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible to the extent they are inconsistent with finding

8

that the claimant does not have an impairment or combination of impairments that functionally equals the listings (Tr. 46). Thereafter, the ALJ summarizes the medical evidence and school record evidence, noting that the Williams syndrome diagnosis was confirmed with genetic testing, that A.H. made progress and was dismissed from speech therapy, that Dr. Asamoah said in December of 2008 that A.H. had been relatively healthy since her initial evaluation and appeared well and in no distress, and that no physician has identified limitations or recommended restrictions for A.H. (Tr. 47-8).

Accordingly, the ALJ found that A.H. has a marked limitation in acquiring and using information; a less than marked limitation in attending and completing tasks; no limitation in interacting and relating with others; less than marked limitation in moving about and manipulating objects; no limitation in the ability to care for herself; and less than marked limitation in her health and physical well-being.

### Treating Physician's Opinion of Disability

The ALJ rejected Dr. Asamoah's opinion that A.H. has significant delays related to her diagnosis of Williams syndrome and should qualify for disability benefits (Tr. 48), indicating,

> Pursuant to SSR 96-5p, whether a claimant is "disabled" for purposes of disability benefits is not a medical opinion but rather a statement of administrative finding which is reserved to the Commissioner. The undersigned has considered Dr. Asamoah's statement that [A.H.] should qualify for disability benefits but has given it little weight as it is not supported by the objective evidence. (Tr. 48)

Under the regulations, Dr. Assamoah's declaration that the plaintiff is "disabled" is not a medical opinion, but is instead an opinion on an issue reserved to the Commissioner, 20 C.F.R. § 404.1527(e). It might be tempting to write Dr. Asamoah's opinion off as that of a sympathetic physician trying to help his patient, and as an opinion on an issue

9

"reserved to the Commissioner" which is entitled to no "special significance" under the regulations.

However, SSR 96-5p instructs as follows:

> In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527(d) and 416.927(d).
>
> Opinions on Whether an Individual is Disabled: Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements or opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

The case law interpreting 20 C.F.R. §404.1527(e) and SSR 96-5p indicates that while the ultimate determination of whether a claimant is disabled is an issue "reserved to the Commissioner," and that such an opinion not entitled to particular weight, *Turner v. Commissioner*, 2010 WL 2294531, an ALJ may not disregard a physician's *bases* for that opinion, *Wills v. Astrue*, 2011 WL 2174986 (E.D.Tenn.) (emphasis added). In fact, 20 C.F.R. §404.1527(e)(1) indicates that in making a determination of disability, the Commissioner will "review all of the medical findings and other evidence that support a medical source's statement that you are disabled."

**Medical Findings and "Other Evidence" that Support Dr. Asamoah's Statement of Disability**

It is undisputed that A.H. was born with a congenital heart defect. By age 3, A.H.'s muscular ventricular septal defect (VSD) had closed on its own without surgical intervention, but she still suffered from mild to moderate supravalvular aortic stenosis (SVAS) and peripheral pulmonic stenosis involving the left pulmonary artery (Tr. 202). She failed the Head Start hearing screening in July of 2006 (Tr. 185), and was diagnosed with some mild low-frequency hearing loss (Tr. 194).

At the suggestion of the pediatric heart specialist, A.H. was tested for Williams syndrome, as SVAS is often an early marker for Williams syndrome. The Williams syndrome diagnosis was confirmed by genetic testing in April of 2007, when A.H. was four years old (Tr. 202-3) and had almost completed her first year of school in Head Start at Breckinridge County Elementary School (Tr.202). It was in the same month of the Williams syndrome diagnosis that Julie Huey applied for childhood SSI benefits on A.H.'s behalf.

Head Start Teacher Questionnaire

A.H.'s Head Start Preschool teacher, Vivian Ford, completed a Teacher Questionnaire at the request of the Department for Disability Determinations on May 4, 2007 (Tr.217-224). At the time she completed the form, Ms. Ford had taught A.H. for almost the entire school year, seven hours per day, five days per week. She noted that A.H. received speech therapy twice a week and occupational therapy once per week. In the acquiring/using information category, Ms. Ford found that, out of seven applicable activities, A.H. has serious problems in three, and very serious problems in two (Tr. 218). Her written comments indicate that the child has difficulty communicating answers; her vocabulary is good, but her production and processing are very poor (Tr. 218).

In the attending/completing tasks category, Ms. Ford found that, out of twelve applicable activities, A.H. has obvious problems in two, serious problems in four, and very serious problems in two (Tr. 219). Some of the problematic activities indicated by Ms. Ford included sustaining attention during play, focusing enough to finish tasks, organizing school materials, and carrying out multi-step instructions. These problems were noted to occur at an hourly frequency for A.H. (Tr. 219). Ms. Ford's notes indicate that A.H. attempts activities, but requires lots of redirection and

11

assistance.

In the area of interacting/relating with others, A.H. fared better than in other areas (which is notably consistent with the friendly and sociable personality traits identified with Williams syndrome). She was noted however to have very serious problems in relating experiences/telling stories as well as in using adequate vocabulary to express her thoughts and ideas in everyday conversation (Tr. 220). Ms. Ford's notations indicate that A.H. "needs special assistance when doing fine motor activities. She can seem to know something one minute, then it is gone from her memory – particularly math concepts such as rote or meaningful counting, recognizing letters, etc. (Tr. 22).

In the area of moving about/manipulating objects, Ms. Ford identified serious or very serious problems in three out of seven areas, with the most serious being in the ability to move and manipulate objects and coordinate eyes and hands to manipulate small objects. Ms. Ford's handwritten notes indicate that A.H. often has difficulty with balance, and has poor fine motor control with no hand dominance established yet.

In caring for self, she was noted to have serious or very serious problems in two out of ten areas. Ms. Ford's comments indicate that A.H. has difficulty feeding herself neatly (it is all over her face). She cannot blow her nose or wash her face. She has problems with snaps, laces and buckles. In the health and physical well-being category, she was noted to have a frequent runny nose and ear infections, as well as a heart condition and slight to moderate hearing loss. Ms. Ford made an addendum in the final comment section of this report on May 9, 2007 that A.H. was diagnosed with Williams syndrome.

Additional Administrative School Records

The Department for Disability Determinations requested the administrative information contained in A.H.'s educational files, and perusal of those records (Tr. 225-262) reveals notations of speech impairment as well as what is identified as an "orthopedic impairment" for which she receives speech/language and occupational therapies (Tr. 226). Her speech was characterized as "unintelligible" because teachers and peers could not understand her (Tr. 227). Occupational therapy records indicate that A.H. has difficulties using her hands with pencil/paper and scissors; has difficulty with fasteners; could not coordinate hands to zip a zipper; has difficulties buttoning, writing and cutting (Tr. 244-5). An Individualized Education Plan was put in place for A.H. on February 7, 2007, because of her speech and visual motor skill difficulties, and it was noted that she tested in the low average range on a cognitive assessment (Tr. 248-262).

Speech and Language Evaluation/Department of Disability Determinations

A.H. underwent a speech and language evaluation on July 17, 2007, and was found to have mild/moderately delayed auditory comprehension skills and low average expressive language skills. She was also found to have difficulties with articulation, and was unable to name categories, use qualitative concepts, correctly use past tense forms of verbs, describe similarities between two objects, name items that fit into a category, complete similes, or accurately count items (Tr. 265-7). Relying in part upon this state agency speech and language evaluation, the state agency physicians found that A.H. has no limitations in four of the six domains, and less than marked limitations in interacting/relating with others and in health/physical well being (280-285). Upon reconsideration, the state agency physicians found less than marked limitations in four domains, and no limitations in two (Tr. 314-319). The state agency physicians' justification for their findings includes the fact

that there is no distinct mental impairment established and that A.H. has cognitive skills similar to age peers (Tr. 314).[3]

September 10, 2008 Individual Education Program

The state agency physicians in this case did not review the September 10, 2008 IEP for A.H. Notably, A.H.'s academic performance is not noted to be commensurate with her similar age peers by age 6, as was relied upon by the state agency physicians upon reconsideration. This more current IEP identifies A.H.'s disability as developmental delay, and reveals numerous areas of difficulty noted in reading, writing, and math. She has trouble with letter sounds and at the end of kindergarten was performing at the Wright Group Level A, when she should at least be at Level D. She has trouble forming legible letters, difficulty copying words to paper because she loses her place. She cannot consistently count to 20, and an inability to recognize numbers generally, and has a hard time abstractly thinking (Tr. 323).

While it was noted that A.H.'s speech skills had improved to the point that speech therapy was no longer needed, it has become clear by this IEP that A.H. is no longer performing academically at a level commensurate with her similar aged peers. In fact, it is noted that she will likely not be able to move on to the next grade level because of numerous problems with letters and sounds in reading and with numbers in math (Tr. 330). Despite putting forth what appear to be her best efforts, A.H. is behind in both reading and math (Tr. 331). A.H. was retained to repeat the first grade (Tr. 167). A.H.'s mother has indicated that despite her requests and a letter from the Weisskopf Center, adequate special education instruction is unavailable to A.H., and she may have

---

[3]This notation is presumed to be taken from the February 7, 2007 IEP notations (Tr. 248) which were observations notably made before cognitive testing showed a score of 85 in the low-average range (Tr. 259).

to attend a special school to receive the services that she will need (Tr. 140).

In this case, it appears that the ALJ took a "glass half full" approach to analyzing A.H.'s Williams syndrome condition and the symptoms she is experiencing as a result. The ALJ chose to focus on certain positive factors: that A.H.'s speech improved with therapy and that her treating physicians have not placed any activity restrictions on her. What appears to be missing from the ALJ's analysis is the fact that A.H.'s condition is progressively manifesting itself in the classroom. The educational records reveal that the problems and delays identified at age 4 in Head Start continue to affect A.H.'s ability to learn, as is reflected in the escalating degrees of assistance that A.H. needs as noted in the IEPs.[4]

While the ALJ was accurate in noting that she is not bound to accept the opinions of "disability" from a treating physician, she is bound to evaluate all of the evidence that would support such an assertion. Dr. Asimoah is a genetic specialist who likely sees Williams syndrome patients on a regular basis. His opinions regarding A.H.'s "disability" is based in part upon the information he no doubt gleans from observing A.H. as well as from his overall general experience with this rare genetic syndrome. He also likely knows of the substantial burden that will be carried by A.H.'s parents in attempting to find educational resources that are particularly suited to her unique learning challenges as well the additional efforts that will be necessary to keep her safe. The undersigned notes that, in conducting a exhaustive Westlaw search for Williams syndrome, not one social security disability case involving Williams syndrome was found in an ALLFEDS search. The only conclusion that can be drawn from such a dearth of case law is that the Commissioner must routinely

---

[4]Educational psychologist Eleanor Semel has noted that, "Educators are confused because the Williams syndrome child tests like the retarded child, talks like a gifted child, behaves like a disturbed child, and functions like a learning-disabled child."

15

grant childhood SSI cases in Williams syndrome cases (as it does with other similar disorders such as Downs syndrome). The only cases available in a Westlaw search pertaining to Williams syndrome were those of parents who have filed suit against public school districts under the Individuals with Disabilities Education Act, §615(i)(3)(B), 20 U.S.C.A. §1415(i)(3)(B) in an attempt to provide an appropriate education for their special needs children. See *K.C. ex rel. M.C. v. Mansfield Independent School District*, 618 F.Supp. 568 (N.D.TX 2009); *Dacyna on Behalf of Dacyna v. School District of Philadelphia Board of Education*, 1993 WL 206271 (1993). Review of these cases indicates that there is a great deal of difficulty in tailoring an educational plan for Williams syndrome children. This is consistent with the statements of A.H.'s mother about her difficulties in getting A.H. the therapies that she needs through the local school. These additional challenges that A.H. faces are surely the types of challenges that were contemplated by Congress when they enacted the childhood SSI legislation noted above.

In sum, the undersigned is not persuaded that the ALJ gave adequate consideration to the testimony of A.H.'s mother, the opinion of Dr. Asimoah, and the supporting educational documentation contained in the record before finding marked limitation in only one domain of functioning.

## RECOMMENDATION

It is therefore RECOMMENDED that this case be REMANDED to the Commissioner for a full and fair review of the educational documents contained in the record, for a consultative examination which evaluates the combined effects of A.H.'s mental limitations and her physical limitations, and for any further development not inconsistent with this opinion.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b), any party shall have a period of fourteen (14) days, including intervening Saturdays, Sundays, and/or legal holidays pursuant to Fed.R.Civ.P. 6(a)(1)(B), from the date of notice of electronic filing within which to file written objections to the foregoing report with the Clerk of the Court. Further and pursuant to Fed.R.Civ.P. 72(b), any party may file a response to objections filed by another party within fourteen (14) days after being served with a copy of said objections. A period of three days shall be added to each fourteen (14) day period. Fed.R.Civ.P. 6(d) and 5(b)(2)(E).

The court shall not conduct a <u>de novo</u> review of objections that are general, conclusory, or merely adopt previous pleadings. The original objections shall be sent to the Clerk of Court either electronically or by mail. A copy of any objections and response thereto shall be served on the undersigned at Suite 330, 501 Broadway, Paducah, Kentucky, 42001 or via e-mail to w_david_king@kywd.uscourts.gov. Failure of a party to file timely objections shall constitute a waiver of the right to appeal by that party. *Thomas v. Arn*, 474 U.S. 140 (1985).